ALBERT S. MILLER v. THE LOZIER MANUFACTURING CO.

1. STATEMENT OF CASE.

The plaintiff had charge of defendant's store in which was located an elevator fitted with an automatic stop. This stop was out of repair and often failed to work, but the elevator could be stopped independent of this stop by means of a cable. By the terms of plaintiff's employment he was to make no repairs without consulting defendants. He called their attention to the defective elevator and they promised to repair it; later they told plaintiff to see the elevator people about it. Plaintiff told an employee to see them, who did so, and to him they reported the elevator to be in a dangerous condition. Later plaintiff and another employee, who started the elevator, used it. They did not make use of the cable, and the automatic stop failed to work, by reason of which plaintiff was injured; *Held:*

2. PLAINTIFF WAS GUILTY OF CONTRIBUTORY NEGLIGENCE.

*First*—That the plaintiff in using the elevator under such circumstances as above stated, was guilty of contributory negligence.

3. EFFECT OF PROMISE TO REPAIR DEFECTIVE MACHINERY.

*Second*—That the promise to repair did not justify plaintiff in using the elevator as he did.

4. EFFECT OF NEGLIGENCE OF FELLOW EMPLOYEE.

*Third*—That the negligence of the fellow employee who accompanied plaintiff was imputable to plaintiff.

5. DUTY AS TO REPAIRING OF ELEVATOR.

*Fourth*—That after the instructions as to the repairing of the elevator were given, the duty to repair such elevator rested upon plaintiff.

6. PLAINTIFF WAS CHARGEABLE WITH KNOWLEDGE AS TO CONDITION OF ELE-
VATOR.

> *Fifth*—The plaintiff was chargeable with the knowledge of the condition of
> the elevator imparted to the employees by the elevator company.

ERROR to the Court of Common Pleas of Lucas county.

PARKER, J.

This is an action brought by the plaintiff in error to reverse the judgment of the court of common pleas, dismissing his petition.

Albert S. Miller began an action in the court of common pleas against the Lozier Manufacturing Co., and in his petition alleges that the defendant is a manufacturing corporation doing business in the city of Toledo, and for his cause of action he says that on or about December 3, 1895, he entered into the services and employ of said defendant at the stipulated sum and amount per month of $83.33. (That date is evidently misstated in the petition, as it appears from the contract introduced in evidence, and from the testimony, that it was September 3, 1895.)

"That his duties as such employee consisted in taking charge of and the conducting, for the benefit of said defendant and its profit, the retail store and business of said defendant located in the city of Toledo as aforesaid, under and pursuant to the directions of said defendant, which said employment was to continue until September 1, 1896. That under and pursuant to said employment he entered upon his duties as aforesaid on or about the third day of September, 1895, and continued in the discharge thereof to and until on or about the sixth day of March, 1886, when said plaintiff was injured as hereinafter set forth. That said business consisted in the sale of bicycles, bicycle sundries, fixtures and repairs, and all accessories necessary to such business, and was carried on at and in the defendant's retail store on St. Clair street, in said city of Toledo, in a building consisting of three stories. In the upper story thereof, as a part of and accessory to said business, there was a riding and training school, or academy, for the purpose of instructing persons purchasing bicycles of said defendant company, in and about the riding and using thereof, and as a part of plaintiff's said duties, it became and was necessary for him, when called upon by parties wishing his assistance, or when he deemed it advisable, to go to the third or upper story of said building used as such riding or training school as aforesaid. That as a part of the necessary machinery and appliances for carrying on the business of said defendant as aforesaid, the said defendant company had placed in said building an elevator for the carrying of freight, passengers, and all other things necessary in and about the promotion of their said business, from the basement and salesroom in said building to the riding academy located on the third floor thereof as aforesaid. * * * The plaintiff further says that said elevator was of a kind and make that was designed and intended to automatically stop at the respective floors of said building in its assent and descent, but the plaintiff says that the said elevator was defective in this, that it failed, by careful and perfect operation, to work as it was intended and supposed to, in that it failed at various and many times prior to the injury herein complained of, to stop automatically as it was designed to.

That he could not tell what the particular defect was, being unacquainted with machinery of that character.

That as soon as he discovered said elevator was defective in its operation as aforesaid, he notified C. J. Moore, then and there the treasurer and general manager of the defendant company, who then and there

Miller v. Lozier Manufacturing Co.

promised plaintiff that said elevator would be by defendant repaired, and said and stated to plaintiff to go ahead, and he, said Moore, would have said elevator repaired.

That the defendant failed to have said elevator repaired as promised, and thereupon plaintiff notified W. H. Raynor, and Raynor promised that said elevator would be attended to and repaired, and the defect remedied, and the elevator should and would be made to operate properly. Plaintiff says that he had no knowledge whatever with reference to the intricacies of the different parts of said elevator, and no knowledge of the manner in which it had been placed in said building. That he relied upon the promises so made, and continued in the service of the defendant and the operation of the elevator until March 6, 1896, when the accident occurred. That on the sixth day of March, while in the performance of his duties in and about the service of the company, he had occasion to use the elevator in ascending to the riding academy; that in thus ascending plaintiff used due caution and care in the management of the elevator,—

And without any fault or negligence on his part, said elevator failed to stop at the third floor of said building, but continued in a rapid manner in its upward course until it reached the roof of said building with such force, and with the force still being applied to the cable, that it caused the spool around which said cable was wound to break, and said cable became and was broken and detached, so that said elevator, with this plaintiff at the time thereof standing in and upon the same, and without any opportunity for him to escape therefrom, was released and rapidly precipitated and fell to the floor in the basement in said building with this plaintiff therein."

Then he proceeds to state the injuries which he received from the fall, which appear to have been of a very serious and permanent character, and prays judgment for his damages, which he fixes at $30,000.

The defendant company answers to this amended petition, admitting the allegations as to its being a corporation, the business in which it was engaged and says that it is "advised that the plaintiff was injured through the falling of an elevator in the said retail store on or about March 6, 1896. Defendant denies each and every allegation in the said amended petition contained and set forth not herein above specifically admitted." Denies all charges of negligence; denies that the plaintiff was without fault; avers that the plaintiff's injuries were the result of his own fault and negligence; and avers also that when the plaintiff entered upon this employment, he did so with full knowledge of the construction and manner of operating the elevator and premises, and that he assumed the risks if any attaching to the use of the elevator in the premises.

At the close of the introduction of testimony on behalf of the plaintiff, on motion of the defendant, the case was arrested from the jury, and the jury was directed to return a verdict in favor of the defendant company, which it did. On account of this action plaintiff in error complains.

Aside from the question of contributory negligence upon the part of the plaintiff involved, the record, which is somewhat large, shows that proof was made of the facts substantially as alleged in the petition. The contract of employment of the plaintiff was reduced to writing. It is very brief, and I will read it:

TOLEDO, O., Sept. 3, 1895.

THE LOZIER MANUFACTURING CO., Toledo, Ohio.

Gentlemen: For and in consideration of the sum of eighty-three and thirty-three one hundredths dollars paid to me monthly, I hereby agree to take charge of your retail department in the city of Toledo, and to conduct the same for your sole interest and profit, using therefor my best judgment and ability, and under your instructions.

My services proving satisfactory, I further agree that same shall continue until September 1, 1896, and at the above mentioned rate, unless otherwise mutually agreed.

                                          Yours truly,
Accepted.                                                    A. S. MILLER.
W. H. RAYNOR, Ass't Manager.

But the plaintiff contended, and introduced evidence tending to show, that there was a limitation, fixed by the conversations of the parties about the time this contract was entered into, upon his authority with respect to making changes or repairs in and about the building where he was employed; and he contends from that, that no duty devolved upon him with respect to keeping this elevator in repair. Testifying upon that subject at page 3, in answer to this question:

Q. When Mr. Raynor was there at that time, what, if anything was said about the use of the elevator in that building? He says: A. Well, he said the elevator was used to go back and forth to the riding academy, and that we should use the elevator. He went into the elevator and went up to the riding academy with me at that same time, and he said that we would not need an elevator boy; that it worked automatically, and all we had to do was to start it, and when we got to the riding academy it would stop; and when we wanted to come down it would stop below. He said that regarding the furniture or fixtures or anything in regard to the elevator, why, "Don't make any changes whatever without first notifying me. Anything in the way of furniture, fixtures or repairs, notify us—we will attend to that." And he said "If you have passengers to come up, it will not be necessary to send anybody up with them; if you start the elevator it will stop of itself—it will save you the expense of an elevator boy."

Now he says that that and other statements of the same sort placed a limitation upon his authority with respect to the elevator, and contained a direction with respect to the method of using the elevator, which he had a right to rely upon thereafter in his use of it. It appears that the elevator was so constructed that by some sort of a safety appliance (which the makers testified was for safety only and not for general or ordinary use, but to prevent accidents), the elevator in ascending would usually stop at the third floor, and in descending it would usually stop at the first floor. It also appears that the elevator had an appliance, a cable, passing through it, by the use of which, pulling upon it in some way, the elevator could be made to start or stop at these floors or at any place between the floors. It appears from the testimony of the plaintiff that he was aware of that fact. He testifies on page 19—

You knew, didn't you, that that rope or cable was the means by which the movements of the elevator were controlled? A. Yes, sir.

Now, with that knowledge that the elevator might be controlled by the use of this cable, and with the further knowledge stated in his petition and in his testimony, that the elevator was out of repair so that the

automatic stop did not work successfully or properly, he, on the occasion that he was injured, used the elevator and allowed it to be run without making use of the cable or rope. His testimony as to the condition of the elevator, which is in accordance, as I have stated, with the allegations of his petition, runs in this way:

"The elevator, at times, would stop perfectly level with the floor; at others, it would stop six or seven inches above, or as much as a foot—sometimes that much—below. Sometimes it would run three or four feet and stop altogether, and then it would start up again and go all right for a while, and do the same thing again. And then, other times, it would go right straight through without any trouble."

He testifies to a number of occasions when the elevator stopped in this way, and that its doing so resulted in the frightening of passengers. There is no evidence in the record except that on behalf of the plaintiff. It appears from that, that on one or two occasions or more the elevator stopped between floors, so that passengers had to be taken out with ladders, and that they were pulled out, or they got out the best way they could. That he was aware of this. And it also appears that through the elevator being out of repair as it was, he was apprehensive that an accident might occur which might result in the injury or the loss of life of some person using the elevator; that he complained either to the manager or to the assistant manager about the condition of the elevator, and desired to have it fixed, and said someting to the effect that he did not desire to take the risk of an accident which might result in an injury or in somebody being killed. It is averred in the petition that he had requested the manager and also the assistant manager to have the elevator repaired; but he testifies that up to the time he received this injury the elevator had not been repaired, to his knowledge—that is, he had no knowledge of its having been repaired. His own testimony, as well as that of other witnesses, indicates that the elevator was gradually and steadily growing worse in its operation, up to that time. On the occasion when he was injured, sometime after business hours, he attempted to ascend to the third floor with a bicycle for the purpose of trying it (which appears to have been a legitimate and proper thing for him to do in the course of his employment), and he was accompanied by Mr. Snyder, who was also an employee of the Lozier Company and a fellow servant of the plaintiff. Snyder, who testifies, discloses that he also was advised fully as to the manner in which the elevator had been working. And it is to be presumed that he was aware of the dangers of using the elevator as it was. And he was also advised of the fact that the elevator could be operated without relying upon the so-called automatic stops, by the use of the rope or cable passing through it. On this occasion Miller took his position in the elevator with his back towards the door of the cage and toward the cable. Snyder undertook to operate the elevator. He pulled the cable, and started the elevator moving upward. It appears then that he paid no further attention to it until after the elevator had passed the third floor and he heard some noise that indicated that some accident was likely to occur, when he jumped from the elevator to the third floor. Whether he escaped injury does not appear, but the elevator went on up, as stated in the petition, until it came to the top. There it broke loose from the cable and fell to the bottom, resulting in injury to the plaintiff. Upon the elevator passing by the third floor, Snyder, according to his own statement, made an effort then to get hold of the cable,

with the purpose in view of stopping the elevator, but he did not succeed, and then thinking it was too late to avert the catastrophe then iminent, he gave that up, and jumped from the elevator.

In view of this evidence, we are of the opinion that it appeared clearly from the evidence adduced on behalf of the plaintiff that he was guilty of negligence in making use of the elevator after he had learned of its bad condition, and especially in making use of it in a reckless manner, by relying on the automatic stop, which he knew was out of order, and had been out of order for many months, instead of relying on the rope or cable which, so far as it appears from the testimony, had never failed to work successfully.

It is urged on behalf of the plaintiff in error that he continued in the employment in consequence of these promises to repair. We do not think that the circumstances of the case would justify him in continuing in the employment and using the elevator as he did use it, even though the promises to repair had been made. But it may be remarked that the evidence shows that in the prosecution of the business there it was not absolutely necessary to use this elevator; that he might have ascended and descended by a stairway; and that on occasions when passengers became frightened and alarmed on account of the eccentric movements of this elevator, they did so ascend and descend.

As I have stated, it appears that his fellow servant Snyder was equally negligent. Whether under all circumstances the negligence of Snyder would be imputable to the plaintiff might be a question; but under the circumstances of this case we think it was clearly so. He permitted Snyder to operate the elevator. He turned his back upon an appliance which might have been used with safety to stop the elevator at the third floor, and saw fit to recklessly omit to use it.

Whatever doubt there might have been under the original hiring and the conversation occurring about that time as to Miller's duty to see that the elevator was repaired and kept in repair, we think it is clear from what subsequently occurred between the parties that this duty devolved upon him; and for that reason, as well as for the reason already stated, the plaintiff is not in a situation to recover. At pages 105 and 106 of the record, Miller, on recall testifies as follows:

"I remember one time I spoke to Mr. Raynor about the elevator, and he said "perhaps you had better call up the elevator company." That is the way I got information that it was the Haughton elevator. He said "call up the Haughton Manufacturing Company, it is their elevator, and have them come up and look over it and have it fixed.

Q. After that talk with Mr. Raynor, what if anything did you do about calling them up? A. When I came down to the store I told Mr. Tracy or Mr. Sanbugh—I think Mr. Tracy—that he had better call up the Haughton Elevator Company and have them come and fix the elevator, and I think Mr. Tracy went to the 'phone right away and did that."

In other words, he was directed to have the elevator fixed. He says that in the conversation about the time of his employment, the parties came to an understanding that he was not to have any repairs done without first consulting the company or the managers of the company and receiving authority from them to have changes or repairs made or expense incurred in that way; but that the duty devolved upon him of having repairs made after receiving such express authority cannot be questioned. And on the occasion with respect to which he has here tes-

Miller v. Lozier Manufacturing Co.

tified, he did receive such express authority and direction to have the elevator fixed. He testifies here, as I have said, that he was not aware that anything was done subsequently about fixing the elevator, but he appears to have delegated this duty to Mr. Tracy, an employee. From the testimony of Mr. Tracy and Mr. Haughton we gather that Tracy made application to the Haughton Company to come and fix the elevator. Mr. Haughton testifies that he came and examined the elevator and found it in very bad and dangerous condition, and that he informed Mr. Tracy of its condition. With the knowledge thus obtained by Mr. Tracy, acting under the direction of Mr. Miller, unquestionably Mr. Miller was chargeable. Mr. Haughton was asked about the condition in which he found the elevator. He answered:

"I found that the bearing which supported the automatic stop at the top and bottom landings had broken loose where it was bolted to the ceiling. The boards had broken out and come down and it had no end support.

Q. Then what did you do? A. I reported it to the store of the Lozier people.

Q. To whom did you report it? A. I think to Mr. Tracy.

Q. To Mr. Doria Tracy? A. I think it was—I wont swear to that."

But it elsewhere appears in the record that his conversations on the subject were with Tracy.

The plaintiff in error cannot hold the company responsible for the result of his own omissions to have the elevator repaired. He says he did not know whether it was repaired or not. He was bound to know, but he continued to use it at his own risk and peril. He cannot tell precisely when this conversation occurred with Mr. Raynor, in which he was directed to have the elevator fixed, but it appears that it must have been as late as early in February, not more than one month before he was injured. It is not apparent that he was subsequently relieved of this duty and responsibility. If the elevator was subsequently used by him or by anybody else without being repaired, it was his fault. If another had been injured—a customer or an employee under Miller, unquestionably the company could have been held liable on account of this knowledge of Miller and the fault of Miller in not having the machine repaired.

We think the evidence of the negligence of Miller from the undisputed facts is so clear that no other rational inference can be drawn from such facts, and different minds could not arrive fairly at different conclusions upon them. For the reasons stated the judgment of the court of common pleas will be affirmed.

*Tourelle, Masters & Adams*, for plaintiff in error.

*Brown & Geddes*, for defendant in error.